Case number 23-1718, Heather Kerchen et al. v. University of Michigan et al., oral argument, 15 minutes per side. Mr. Schwartz for the appellants. Good afternoon, Your Honor. Maine Police Court. This is Brian Schwartz on behalf of defendants, appellants, University of Michigan, and Dr. James Woods. I requested to reserve four minutes for rebuttal. All right. Your Honor, Todd Kerchen died from a drug overdose and alcohol abuse in 2000, from drugs that he illegally purchased from Christian Rafalides, who is a defendant in this case, but not a party in this appeal. How do you know it was purchased from him? That's what the plaintiffs are alleging in the complaint. So just going off of what they say in their complaint. This case involves the Kerchen family's attempt to hold the University and Dr. Woods liable 23 years after the fact, Given the passage of time, the University's sovereign immunity, the lack of any legal justification to toll either the time to file a notice of intent to sue under Michigan law for Michigan state claims, as well as the statute of limitations for all claims, there were several clear reasons I believe this case should have been disposed of on the pleadings. Well, we're the courts familiar with the briefs, and I just kind of want to highlight some of the key points that we rely upon. First, I think the cleanest one is the sovereign immunity argument, which bars all claims against the University, state or federal, state and federal, and against Dr. Woods in his official capacity. These issues should have been addressed prior to allowing discovery, because sovereign immunity provides a defense from being subject to litigation, not just the defense on the merits. Here, plaintiffs only seek monetary damages, and the 11th Amendment forbids damage claims pledged against the University, which is indisputably an arm of the state, in federal courts under the claims pled. Plaintiffs effectively concede sovereign immunity applies, and they pursue this, what they even refer to as a novel theory that it was somehow waived here. I believe that the court should reject this theory of waiver. First off, the case law is, we cited a good amount, a colleague put together a good amount of citing this case law that says a waiver of sovereign immunity must be unequivocally expressed. Plaintiff's theory, the flaw with plaintiff's theory here is it's an implied theory of waiver. We rely on this case Lewis v. Clark, and we do not believe that it can support plaintiff's novel theory. First, that argument, there was no theory of kind of waiver based on the Lewis v. Clark theory in the lower court. But second, all Lewis does is it stands for the point that Dr. Woods couldn't rely on the indemnification of any claims against him to claim that he is immune under the 11th Amendment. In other words, he can't claim that because there's a policy that indemnifies me, I've somehow acquired some roles of the sovereign here. But that's not what at issue. We're not asserting that Dr. Woods' individual claims has sovereign immunity. So there is no waiver of claims by the University itself, or no waiver of sovereign immunity. Second, it's a qualified immunity issue. We believe this requires, this deals with just the individual capacity claims against Dr. Woods. There's no reason to even need to wade into this, whether it's clearly established, whether they put it, because of the glaring statute of limitations issues, which I might get to later if I still have time. The Supreme Court has repeatedly instructed courts not to define clearly established case law at a high level of generality. And we're not arguing here that the right has to be established in the exact factual circumstance. I agree that that's not the case law. But what it's got to do is there's got to be a kind of robust case law that puts it beyond dispute here. In a lot of police cases, it's pretty easy to look at what happened in a body of case law and say, well, you should have known that just because there was new technology involved, that was also cruel and unusual punishment, just because a manufacturer came up with something new. That's not what we have here. There's got to be case law that must be something to put Dr. Woods on notice that what he is alleged to have done here, oversee lax policies of an animal lab, would somehow violate a substantive due process right to life of a member of the general public who has no normal connection with that lab. The substantive due process right here, I don't believe, is implicated because you can't just refer to a right in the abstract, and we believe that's what they do. And they don't connect it to what Dr. Woods is alleged to have done here. But even if we say that they said that there was, if they plausibly pledged that there was a clearly established right, and we don't believe there is, the maintenance of the policies here doesn't rise to that level of kind of shock to conscious behavior where there is a violation of a clearly established policy. Qualified immunity gets you, or gets Dr. Woods in his individual capacity, would make him immune from the federal law claims, from the 1983 claims. Can you address the state claims against him in his individual capacity? Sure. So for the state claims, and this gets me right where I was going next, the qualified immunity, the analysis is essentially the same. The failure to plead that conscious shocking behavior prevents plaintiffs from overcoming the Michigan Governmental Tort Liability Act, the GTLA. They can't just allege that he engaged in negligent behavior. They have to allege that he engaged in grossly negligent behavior. And we don't believe the allegations as pled rise to that level. They're somewhere in between like shocks to conscience and gross negligence, right? Their allegations are? Well, you're talking about the qualified immunity analysis kind of mapping over the immunity under the Michigan immunity statute. And one seems to, at least for the constitutional violation, have a shocks to conscience standard. And am I correct that the state immunity statute has a gross negligence standard? Correct. And that's probably a little bit less harsh, I guess. It's not as high of a burden to prove. But the bigger problem with the state immunity act is you have to prove, regardless of whether it's gross and how it compares to the shock to conscience, is you have to prove that the actions were the proximate cause. And that's very hard. I mean, if you look at the complaint, it's a law school examination of the chain of causation here that gets you to the death. And I think there are too many levels there that you can actually say that you plead around it for the purposes of a motion to dismiss. So the next point I want to turn to you briefly is setting aside any 11th Amendment issues with claims that are, the state law claims that are pled against both the university and Dr. Woods in his official capacity, is this notice of intent to sue aspect. MCL 600.6431 requires a plaintiff who's got a claim against the state and the university counts as a claim against the state has to file a notice of intent to sue within six months if there's a personal injury claim. There's a one-year provision in that statute which deals with other claims, but I think it's undisputed. These are personal injury type claims, but it doesn't really matter. The Christie versus Wayne State University case, which was decided last year, made it pretty clear that this rule applies to all claims against, all state claims against the state, regardless of the form. Whether it's in federal court, if it's an administrative claim, it does not matter where that is. The court there then applied that rule retroactively to the case before it. There was another case, the Elliott versus University of Michigan case. It applied it retroactively to that case. But it applies only to the state claims. It only, yeah, this would apply to the state claims. Not to the 1983 claims. Correct. Okay. Just wanted to clarify. I wouldn't, if you want to find that it applies to the 1983 claims, I'm sure my clients will accept that. No, I understand the difficulties with that, but yeah, I just wanted to make sure. It only applies to the state claims. So this is an issue that most of the time arises in state court, because your sovereign immunity arguments, you don't necessarily get to the notice of intent. But it also has been applied retroactively in the two cases that we cited in our notice of supplemental authority, the Browerman case and the Dieterich case. And the plaintiff said, you know, they acknowledged that it was applied retroactively in Christie. But they asked the court to create a special rule of you should only make it prospective for us, because somehow we relied on Tyrell. It's a Tyrell decision. One of the, or there are two primary problems with that. One of it is they never filed a notice of intent. Even after we raised this issue down below, even after Christie was decided, even after we had the supplemental briefing on the issue, they still never went back and filed it. They can't cure it now. There is Michigan case law that says if you kind of miss the six months, it's kind of, there's no equitable tolling for that. But even more so, their claims accrued like decades before Tyrell. So it's like you can't rely on something. If your claims are stale for 20 years and then a case happens and then that case gets reversed, you can't say, well, that case that arose 20 years after somehow revised my claims. So we believe that the district court erred here in failing to provide, apply the notice of intent requirements retroactively. And, you know, the Michigan Attorney General arguments, I think, are equally on point here. And the last point I want to get to, which is the one that we raised, you know, this is one that applies to all claims. So it's not like claim parsing. This is one of those ones where there's different arguments apply at different levels. This is the statute of limitations. All these claims are easily untimely. There was really no argument that the claims didn't accrue, you know, 20 years ago. There was some argument that plaintiffs said the claims didn't accrue until I got my response to a FOIA request. And I think the district court correctly got that correct. No, under Michigan law, the claims accrued when the death occurred. Therefore, the plaintiffs had to file their claims within three years, just looking at the statute of limitations, putting aside the notice of intent, and they indisputably didn't do that. Plaintiffs, when that happens, often make allegations of fraudulent concealment. They put some detailed, robust allegations in the complaint to try to get around that. They say the defendant did something that prevented me from knowing my claims. It doesn't have that here. The most they get at is they say a party that's not even a defendant, the Washington County prosecutor, said stuff that misled us. There's no allegations that the university or Dr. Woods engaged in any wrongdoing. And the district court agreed with that. They said, yes, there's nothing in the complaint that says, but let's have some discovery here. I mean, that flies in the face of, you know, Twombly and Iqbal. If you're going to have, kind of, get by a motion to dismiss on fraudulent concealment, you've got to have plausible allegations of fraudulent concealment by the university or Dr. Woods in a complaint. And that wasn't here. If there's no further questions, I'll wait for my rebuttal in a couple minutes. There's some allegation that the detectives investigating this kept some of the information on the rafts pertaining to concealment of the underlying facts. Yeah, so the allegations that involves the Washtenaw County prosecutors are Washtenaw County Sheriff's Department. The allegation in the complaint, as I understand it and recall it, is that they didn't affirmatively share the information with, you know, with the plaintiff's family or with Todd Kirshen's family. None of that was attributable to the university. And, you know, none of those actions are attributable to the university. By the way, Mr. Raffalidis, I'm probably mispronouncing his name. Was he ever served? Is he apparted to these proceedings? He is a named defendant, and I wouldn't know if he was served because I do not represent him. Okay. And I don't think the district court has taken any action on the docket with respect to him. All right. Okay. Thank you. I know you say that, you know, of course, 20-something years has passed. Just one quick question. You know, why should the court exercise pendant jurisdiction over these statute of limitations arguments? Sure. I think the statute of limitations, I think the jurisdiction over the qualified immunity argument, and I think it's wrapped up within the qualified immunity argument, there's an easier way to resolve that question without dealing with the constitutional issue because, you know, this is simple. You know, my kids could tell you that those claims are time-barred. I mean, they would see it without a, you know, a fraudulent concealment argument. You know, it's something that I think could be done in a couple sentences. You know, and the constitutional with qualified immunity, that's where there's often a lot of disputes about whether it's clearly established or not. So I think it's a way for the court to resolve it, kind of one of those kind of merit-skipping disputes or, well, you know, yes, we should address the immunity first, but let's, you know, let's resolve the easier issue. Thank you. Afternoon, Your Honors. May it please the court. Dustin Kuntz for Lori Dale and Heather Kirchen. The University of Michigan and Dr. James H. Woods are factually responsible for the death of Todd Kirchen. That is what the procedural posture of this case requires this court to assume, and it's also actually true. You know, you make that statement in your complaint, but do you allege in your complaint any evidentiary basis for the statement that they're responsible? Well, Your Honor, I don't know that it's spelled out that explicitly, but we allege facts sufficient to, I think, to make that plain, that that's what our allegations are here. Well, what are the facts you allege? And the reason I ask that is this Raffalidis, however you pronounce his name, had access, well, Mr. Woods also had access, I believe, to the lab and the substances, but what's the evidence that these people took the items of the fentanyl or whatever the substances were from the lab and transmitted to your, you know, deceased? What's the evidence that you plead connecting these people and the wrong that was purportedly done? Yes, thank you for that question, Your Honor. I don't think there can be any doubt that the fentanyl that killed Todd Kirchen originated at the University of Michigan Pharmacology Lab. The reason I say that is, first of all, while I do recognize this cuts against us in some respects, this happened over 20 years ago, almost a quarter of a century ago now. Everybody knows about fentanyl now and what it can do and it's readily available on the streets, but in the year 2000, that wasn't the case. There were limited places where fentanyl could originate from. More specifically, in this case, there is another death that Christopher Jeterio, he was a student at University of Michigan, he also died of what we believe was fentanyl that originated from the University of Michigan Pharmacology Lab. Wasn't there scientific testing or something that showed it was the exact same structure from what was in the lab and what he overdosed on? That's right, Your Honor. And did a girlfriend or someone testify that they got the drugs from Raffalidies? From Raffalidies, yes, Your Honor. Right, and we know that he worked at the lab and he had all these vials still in his locker months and months later. That's exactly right, Your Honor. One small correction, I think at the time of Todd Kirchen's death, Raffalidies had been fired from the University of Michigan Pharmacology Lab. But when detectives responded to the scene of Todd's death, they found a vial that had a very peculiar marking system on it. So there's an aluminum clasp on the top and it had the initials, I'm blanking now, I think JD or DJ on that clasp and it had a date. That was matched up with University of Michigan Pharmacology Lab records showing that somebody by those initials had checked out the fentanyl in that amount, although I think there was a .16 gram difference between what was in the log and what was actually checked out. That person was Christian Raffalidies' mentor and predecessor within the lab. And Dr. Woods, in interviews with the police, said that this is the marking, this is our marking system, it is unusual, it's unique to us. And to Judge Blomkatt's point, it was confirmed with I think the State Police Crime Lab, I believe, that it was the same molecular structure as what they had at the lab. Where Dr. Woods and the university are on the hook here is because it was so easy for those drugs to get out into the streets. Wait a minute, I'm still trying to get the answer to my question. An empty vial was found in the residence of the deceased that had markings similar to those used in the lab. And that's the only thing that there is connecting all these people in terms of causation for the death that I've heard. The vial which was empty and the fentanyl, if that's what was in there, has to be connected somehow to the actors against whom allegations have been made. I'm just trying to see what's the causation evidence that connects Woods and even Raffaelli such that they might be deemed to have been responsible for the deaths. That circumstantial evidence that you mentioned is relevant, but that doesn't seem to be enough to create any causation. I don't think there's any doubt, certainly on our pleadings, that there's factual causation. I think it's a closer issue whether there's proximate causation because I think it's plain that the fentanyl Okay, but what facts do you allege in your complaint that would support the allegation of causation as between Woods and the lab and the alleged negligent actors here? So with Raffaelli days, it's an easier question. He's the one who took the drugs out of the lab and got them into first Christopher Jotario's hands and then, relevantly here, Todd Kirchen's hands. Well, how do you know he gave drugs to Todd Kirchen? Well, Todd's girlfriend at the time said so, that it came from Christian. Christian worked for the pharmacology lab. Again, the unique markers on the vial show that it came from the pharmacology lab. Subsequent forensic scientific testing showed it came from the pharmacology lab. So I think the issues that we're wrestling with right now are how are Dr. Woods and the university potentially liable here? And I think that goes to the policies that were or pertinently were not in place to keep these lethal substances within the pharmacology lab. Again, I pointed to the fact that the vial of fentanyl that killed Todd Kirchen, it was matched up to checkout logs on a certain date to a certain individual. But notably, the quantities that were logged and the quantity that was actually taken were different. Let me ask you this. The lab, according to what I'm seeing in the briefs and such, the lab was open twice a day for an hour each, during which substances could have been removed or stolen or whatever, because it was during those times that the students and people in the lab had to have access. So that event that the lab was, there was access supposedly to those drugs a couple of hours a day, such that the lab workers and people could have access. Even if the fentanyl was stolen during those times, how does that amount to gross negligence or behavior that shocks the conscious by Mr. Woods or the lab itself? Yes, thank you, Your Honor. So the hour-long windows twice a day that you're referencing, that's when people could legitimately get access to the substances, or at least that was the idea. Dr. Woods, in his interviews with police, told them that sometimes he would oversee it, oversee the checking in, checking out. Sometimes he would have his secretary do it, and sometimes nobody would oversee it at all. And this kind of gets to my point here, is that these are lethal substances, these are addictive substances. It's entirely foreseeable that if you're not closely supervising these things, if you're not closely inventorying these things, then what happened to Todd Kirchen is to be expected. Unless there are any further questions about causation, if I could address some of the other legal arguments, Your Honor. Sure, go ahead. Can I ask you about some of the jurisdictional questions? Yes, thank you. Do you agree that we have jurisdiction, I agree with your colleague here, that we have jurisdiction to resolve the question of Michigan municipal liability, or Michigan kind of the immunity law? By exercising pendant jurisdiction, is that the question? Or, quite frankly, because, I mean, I think we have cases that have considered it a final order that we have jurisdiction under 28 U.S.C. 1291. Your Honor, I think with the issues that are before the court today, I don't have any issues, I don't have a problem with the court resolving all of the issues that are currently before it. Does that answer the question? Yeah, I mean, we have a responsibility to make sure we actually have jurisdiction, whether you all want us to decide issues or not, and I'm trying to discern what the basis of that jurisdiction is in your view. Sure. Well, I mean, there, I think it's because of, you know, what the district court did below was take up some of these issues without ultimately resolving the sovereign immunity issue. That brings us before the court today, and I kind of agree with the University that, you know, if we're here anyway, and the district court already decided some of these issues, this is an appropriate time to review some of those decisions. Yeah, if you want to explain why you don't have a problem based on sovereign immunity or governmental immunity, this might be a good time. Yes, thank you, Your Honor. So governmental immunity, I think what we're faced with right now is not a substantive issue with whether the state has statutorily exposed itself to liability. I think it does that both under the Michigan's Government Toward Liability Act and the Drug Dealer Liability Act, which importantly defines a person as including a governmental entity. So what's really the issue with governmental immunity is two recent Michigan Supreme Court decisions, Elia and Christie, that said it does not matter where you sue the state of Michigan. You must either file in the Michigan Court of Claims the actual lawsuit, or you have to file a notice within the Michigan Court of Claims. And depending on the nature of the suit, there are certain time limits in our case, because this is a personal injury case, it would be within six months. Now, importantly, when we made, well, I think the, I guess the timeline of how it played out in our case is really important to design that issue. Heather Kerchan discovered Dr. Woods and University of Michigan's potential liability in October of 2020. In December of 2020 is when the Michigan Court of Appeals published its decision in Tyrell. Importantly, a published decision in Michigan means it is the law in the state of Michigan. And then we filed suit in October of 2022. In May of 2023, that's when Christie and Elia came out, and yes, those decisions were applied retroactively in those cases, but I think the positioning of the plaintiffs in those cases is really important because they did not have Tyrell to rely on. They only had the plain language of the statute. In those cases, the Michigan Supreme Court said, well, this is the plain language of the statute, that you must file this notice in the Court of Claims, even if you are filing in federal court. We thought, because of the published decision in Tyrell, that if we are filing in federal court, we need abide by the notice requirement of the Court of Claims Act, which is in a different chapter entirely in Michigan's compiled laws than the Government Tort Liability Act or the Drug Dealer Liability Act. I see you've only got about a minute left. Would you address the sovereign immunity issue? Yes. Because, I mean, the defendants have filed a motion to dismiss. They've not clearly waived sovereign immunity, at least once in its official capacity at the University of Michigan. So I know you're relying on this one Supreme Court case.  Lewis v. Clark. I'm just wondering if that's the linchpin of your... At this stage in the game, yes, that's the linchpin, Your Honor. We're asking for a novel application of an old rule that a sovereign may, by its actions, waive immunity. So, for instance, if it were removing a case to federal court, that in and of itself, even though we're not explicitly waiving Eleventh Amendment sovereign immunity, that act would do that. So that's the sort of... It requires one extra logical step to get from... Because most of the cases say, you know, the sovereign has to... It's the sort of thing you have to make clear. You know, we treat waiver pretty, you know, with some degree of sanctity, I might say. So this does take some bit of a novel approach, I guess, as you put it. I think that's right, Your Honor, but I think it's a logical one. Okay. Thank you. Your Honor, briefly, two points. First, on the question about jurisdiction to resolve the state notice of intent issue, the notice of intent acts in Michigan as kind of like a limited waiver of Michigan's right to be sued. So in state court, if you're going to sue, you have to follow those rules. So it's considered, you know, a kind of a waiver, a limited waiver of immunity. So I believe it could be treated like all the other denials of immunity here. You know, I think that's kind of a jurisdictional hook there. Another quick point is there's kind of a reference to the GTLA and the Drug Dealer Liability Act and how it defines governmental immunity. I don't think there's any... Governmental Tort Liability Act, just to be clear, it doesn't waive the university's... It doesn't waive immunity for the university to be sued here. It's just a waiver for certain people to be sued in state court. Drug Dealer Liability Act, there is nothing that the state has actually waived its right to be sued as a defendant there. I don't think there's any... We make that argument in our briefs. I don't think Michigan courts have ever found that the state can be sued or has waived its ability to be sued under that statute. But I don't even think you have to get there because I think for the state claim and the sovereign immunity makes it clearer. If there's no questions, I will give my time back to the court. All right. Thank you very much. Thank you very much. The case is submitted.